Day three of the West's courtroom panel, we have one case up for argument this morning, number 23-20502, Wynn v. Harris County. We're ready. Mr. Kellerman. May it please the court. Your Honor, Vincent Young was rather young when he was in the Harris County Jail as an inmate, a pretrial detainee. And he eventually committed suicide due to withdrawal from Xanax, which is a very common thing. This is not a rarity. This is not a rare thing. There are many people who take Xanax and they end up, many of them end up in jail. As a matter of fact, I had a case where a person died in the Galveston County Jail of the withdrawal. And that case settled, so that's why this one isn't here. But this happens quite frequently, so this is not uncommon. Doctors are trained to withdrawals. Dr. Lau, he was a doctor. And when Mr. Young went in the jail, he had a long history of previous use of Xanax, as well as previous suicidal ideations and serious mental health conditions. Yet Dr. Lau did not follow what was probably his training and what he should have done and either prescribed Xanax, because there's no law against prescribing Xanax, or done a taper. But instead, our expert witness, Dr. Axelrad, who's probably had many reports in this court here, testified that that was basically wrong and caused him to potentially commit suicide. Even Dr. Lau knew that it was possible to commit the suicide if you're taken off of Xanax because of the suicidal ideations. And Dr. Lau did not even instruct any guards or anybody at the Harris County Jail to put Mr. Young on suicide watch, even though he had many symptoms. He was reaching out to people, and there was this access to this very lengthy medical history. Because when you have a suicide watch, there's many levels. The first level is you get rounds more often. Now, some people try to blame Mr. Romero, who did not do his rounds in time. But even if he was doing his rounds in time, he wasn't on suicide watch. And you could easily commit suicide by hanging, which was what happened, because he wasn't on suicide watch. They gave him the most common form of the way that inmates commit suicide. They gave him a blanket. And that takes generally about eight minutes. In another case I had, I've seen somebody commit suicide about eight minutes with a blanket. And there's no screaming or hollering or anything, nothing drawing to attention. And to compound things, Harris County, in the prison cell where he was, was a button, a medical button. So if you imagine yourself, a lot of times prior to him. Just because time's ticking, can you pinpoint where the reversible error is in Judge Ellison's ruling? OK, well, the reversible error, Your Honor, is that Allow did not, well, first of all, he didn't have a written ruling. Basically, all he put down that are in his ruling, at the end of an ROA 223-2052. Would it be fair?  No, no, no, just iterating what you're saying. Not so much what he wrote. But you know Judge Ellison's been on the bench a long time, has seen a lot of these, just like you have. So it's on appeal for a reason. So let's cut to, you know, we know the history and so forth. So tell us why we should reverse. Dr. Allow followed this written procedure that was actually put on a tattered piece of paper in the clinic and had been there for four years. But it was a part of their orientation that you don't give Xanax. It was a blanket policy. It did not say, do an evaluation to see if it fits in. Just don't give him any Xanax. When our expert witness said that that can lead to death as it did. I guess three quick questions in that. So we're not even, right now we're not even dealing with the threshold question of qualified immunity. It looks like Judge Ellison went directly to whether there's a constitutional violation or not. Is that fair to say? Well, I can jump right in the call. No, no, no, no. Let's stick with the constitutional violation. So just pressing a little bit on issues of fact. When you say this tattered little sign said no Xanax, did it actually say no Xanax or was it a flow chart about other drugs? It was a flow chart that did not include Xanax. Did it use the word Xanax anywhere in it? I think it might have, or as a prasolam, or it left it out. So it doesn't say no Xanax. It just directs doctors or medical personnel to other things. Right, exactly. Even though it's. But you're construing that to be a no Xanax policy. Right, and that's what it amounts to, is a no Xanax. OK, a couple of other quick fact questions. Is there anything in the record to say that the deceased had a prescription that could have been continued? Or is your position that Dr. Lau had to himself prescribe Xanax? Well, he has to prescribe Xanax in the jail because he was taken from the state. But my question is, is there anything in the record that shows that the deceased actually had a prescription? Or is your position that the deliberate indifference argument assumes that Dr. Lau had to commence a treatment? Two things there. One is, there was some testimony from his wife about Xanax. We didn't have any prescription to it. But if you're withdrawing from Xanax, your body doesn't know whether it was due to a prescription or not a prescription. And so you need the Xanax anyway. So the problem now has become the withdrawal and not the original. And there's no record dispute. Dr. Lau did examine him, is it correct, after he'd been 12 hours at a hospital? Yes. And then when he did, he did prescribe two different medications, one and then a more aggressive one. So I think it's fair to say, reading the transcript, Judge Ellison said, this is a very legitimate battle of experts. And Axelrod may be right that one treatment approach would be continue them on a Xanax. But why would you say, Judge Ellison's discussion of that is wrong, that what you've identified is a really deep debate in a medical world? I would argue, Your Honor, that it's not a deep debate. Because this withdrawal from Xanax, and as set forward by Dr. Axelrod, is very dangerous and can cause death. And that was one of the things he could have done but for the policy of Harris County, which had sat there for four years. And I might as well jump into this. And that is, it is possible, and we're not saying in this case, it is possible, that a doctor will not be deliberately indifferent, yet the government here, Harris County, can buy a written policy, because it applies across the board. So this written policy that was in effect for four years and was in the orientation, which, by the way, of course, is a part of your training, is some of the training that we're saying was unconstitutional. Because it left out, when you're a doctor, you're supposed to. What's your best case that a doctor following a policy that recommends certain type of drug treatments for withdrawal could rise to deliberate indifference? What's your best case where it's really a choice among medications? Do you have one? I do not know. See, that's sort of the problem here. I mean, the very tragic jail suicide. But as I understand it, he comes from a hospital he's looked at. Lau does send him to an infirmary. And a lot of other medical people did see him. Now, there may be other issues that were wrong in the jail. But I'm struggling with your focus on Dr. Lau's. He was the one who did the subscription. And there was never any change to that. There was no really intervening. What do you mean, subscription? But I'm not equivalent of words.  He did prescribe two other drugs. So that's where I come back to, where's the case that a doctor's choice of one drug instead of another gets you to deliberate indifference? I don't know if we had put that in. Well, wouldn't that be important? We could find one, yes. I'm not certain it's there. But getting back to the institution, now, when an institution itself does the same thing, it's not as high as a standard for an individual. Because the institution itself, Harris County, required that he not get Xanax, even though an individual may need Xanax. It took away the doctor's choice. And this is what Harris County did. And that was a part of their training, as well as a written policy. Now, Judge Ellison makes a big deal that you'd need both pattern and practice and a policy. But that's not the case. The case law is you can just have a one-time event. And also, in this particular case, this could be a condition of confinement. Because when you go into the Harris County jail, the third largest jail in Texas, third largest jail in the United States, you won't get Xanax. So in that sense, it's an episodic condition of confinement that happened because of the policy of the Harris County jail. And once again, I must stress that this Xanax withdrawal suicide and potential death is not uncommon. This is not like a one-off. This happens quite a bit. And as Dr. Axelrod said, if you're withdrawing from something, you wean them off. You either give them some or you wean them off. I had a case in Montgomery County where a person died of alcohol poisoning, I mean, alcohol withdrawal. And you could have just given them a little alcohol, a couple bucks worth, and that wouldn't have happened. So in that case, settled. And that's why you don't see it here. So that's what we see as the biggest problem is this one-size-fits-all. What is it you want this panel to hold? Well, we want to reverse the ruling by the judge. And we want Harris County to be back in the case. I mean, I know what you want. But I'm saying you articulate for us the holding we would need to pronounce in order for you to get the relief you're asking for. Let me hear what the holding would be. That you overturn the judge grant of summary judgment as to? Well, that's telling me what you want to happen. I'm asking you to articulate what the holding that Judge Ellison would read would say. Well, you'd hold that when a, as far as Harris County, when a county did. It's compelling that you're struggling to tell me what the holding should be. I wasn't expecting this. But anyway. Well, I mean, you're here on appeal. You're here on appeal in front of three judges. You've got a tragic suicidal case. You can't just tell us history and policy and so forth. You want us to reverse. I mean, you've got to either tell us why there is a constitutional violation. If not, why? Why do you win? I mean, the bottom line. Well, I would say that you hold that a county cannot dictate a particular medical course of action for all individuals and not consider the individual particular history and circumstances of an individual inmate. And such a policy, if that causes a death, could be a constitutional violation for failing to provide medical care. What should they have done exactly in your view? Given them Xanax or weaned them off with Xanax. And they didn't give them Xanax because they don't do that generally or what? Yes, there's a written policy. Written policy says no Xanax. Or it's in the testimony, they agreed that it amounted to no Xanax. It's a flow chart, which has been on the clinic wall, which is followed by everybody, has testified for four years. And it's on a tattered piece of paper, but it's taken from their orientation. And if you look at that, it has no room for Xanax. There's no Xanax in it. And they admit that there's no Xanax being prescribed at the Harris County Jail, even though Xanax is a common medication that inmates come in with. And Dr. Geis, who was the medical director, testified that there was only one example, which he recalled where he had ever prescribed Xanax. And that's what he testified to. And so that's the maximum amount was one in the many years that he was there, which would be, he would have seen thousands and thousands of clients. So the constitutional violation of not giving out the Xanax as a possibility, we're not saying do it all the time, but totally eliminating it is what led to his eventual death. So what do the rules of engagement say about a detainee who comes in with a prescription of any sort? They take the information, I take it. That's correct. They say, what are you on? You write that down. And then they just won't prescribe Xanax. That's correct. Is there other stuff they don't prescribe? I mean, is there a list of we don't do X, Y, and Z, and we do do A, B, C? Not that I'm aware of, Your Honor. In this case, it was only Xanax, so we did not look into that farther. Thank you. All right. Thank you, counsel. Your third rebuttal. All right, we're here from Mr. E. Good morning, Your Honors. May it please the court. My name is Stuart Milch, and I'm here on behalf of Dr. Patricia Lau. The district court was right, and Judge Higginson and Judge Stewart, you were right. This is a tragic case. Nothing said here this morning is meant to diminish that at all. I want to emphasize that. But as this court said in Bonilla against Orange County, Texas, in the realm of detainee suicide cases, this court is really reluctant to find that general evidence of an inmate's mental health necessarily leads to subjective knowledge of the fact that an inmate might kill himself. That is essentially what plaintiffs are asking. We ask that you decline that request and affirm the district court. Well, now, wait a minute. What did you just say? Run that by me one more time. Plaintiffs are essentially asking that this court find that generalized evidence of an inmate's mental health, whether depression, anxiety, invariably leads to knowledge that the inmate might kill himself. And that's exactly what this court rejected in Bonilla. And we're asking you simply to do what this court has done in many other cases, which is say, just because an inmate comes in and may have had, in fact, Bonilla is really like this case because the inmate, the detainee there, was coming down off of, among other things, Xanax. And this court said, no, no, no. Just because an inmate is coming down off of drugs doesn't necessarily lead to the conclusion that the inmate, the detainee, might kill him or herself. And then, but. You're here arguing, though, Justice, to Dr. Lau and what he did, correct? Yes, Your Honor. And. Because there are red flags all over that this, the deceased, was suicidal. There's no issue of, correct me if I'm wrong, that everyone knew this man had suicidal ideations? Well, no. I have to disagree, Your Honor. And we can start with his medical intake at the Harris County Jail. Well, no. Isn't it true that several times over the seven days he actually said to people, I'm suicidal, essentially? Or do you disagree with that? No, I think that's a report from another inmate who told a jailer. But that doesn't impute knowledge to Dr. Lau. Your position is Dr. Lau was unaware of the various suicidal red flags. Agreed. There's no fact dispute as to that. There is no. I mean, again, we can start with his intake at the Harris County Jail. Is that the basis for, to the extent that we can discern it? Is that the basis for Judge Ellison's denial? Well, Judge Ellison's denial, this court can affirm on any. Yeah, but what do you discern to be his reasoning? I mean, I think what Judge Ellison said was there's no way of getting around Supreme Court precedent on qualified immunity. And whether he meant that was because Dr. Lau did not have subjective knowledge of Mr. Young's intent to commit suicide, or whether because he was not deliberately indifferent, I don't know. But this court can affirm on either ground. I don't think you get to the deliberate indifference argument, because there was no. Our law has said we have to ask, had he actually drawn the inference that Mr. Young was likely to commit self-harm? Is that basically it?  I mean, he must draw the inference, and then he must. And you're saying he didn't, because the evidence shows that he was actually treating him. Well, he couldn't draw the inference because there was no evidence in the record that Mr. Young was suicidal. OK, that seems to me a bit of a steeper climb to me. But you may be right when we give it a close analysis. It seemed to me that Judge Ellison was saying, even assuming that everyone in that prison knew that over the seven days, this guy was really red flag after red flag, even assuming that when it was focused just on your client, he made a medical decision. It may have been the wrong one, and Ellison didn't imply that. But ultimately, it was just a choice among various treatment. I thought that's what Judge Ellison had said. If that's what you think. Well, I'm asking you. I'm asking you what you think the primary basis for us to affirm as to your client is. And you're saying there's no issue of fact that he ever knew Young had suicidal ideations. I think you can affirm on either ground. I know. What was your recommended one? Well, certainly I'd be happy with either, Your Honor. OK, that's twice you said that. Which is the stronger one, or you just think they're both locked? I think if you look at the medical records from Harris County, and not just the intake, but I mean, let's take a look now at the medical record that's dated 12 hours after Dr. Lau last sees this patient. Nurse practitioner, Kennequa Thompson. This is at 11.45 on February 13. So again, this is about 12 hours after Dr. Lau last sees him, and about three to four hours before he actually commits suicide. Her notes are, history of psychiatric hospitalization, no. Outpatient mental health treatment, yes. Anxiety and depression, sure. Currently have suicidal ideation, no. Do you have a plan, no. And this is page 5090 of the record. History of suicidal behavior, no. Unusual behavior, no. Attitude, cooperative. Emotions, appropriate. OK. Well, there were as many as 12 different medical personnel nurses that did see him all in this period. So you've now perhaps suggested that this lady, who isn't a defendant here, there was no evidence as to knowledge. She might have been a defendant at one point. But today, you're speaking about your client. So my point is that if he's denying suicidal ideation from day one, and we can look at that record. I mean, here. I mean, page 5040 of the record. Are you having suicidal ideations or thinking of killing yourself at this time? No. Have you ever attempted suicide? If so, when and how? No. So that's February 7th. This is five days before, or February 8th. You probably know the record better than I do. I would think someone who is suicidal and deeply depressed might defensively, as this man did, deny a psychiatric evaluation. Several days in, they ask him, do you want it? He says, no. To me, that's not, oh, well, now everyone doesn't think it is. Because my recollection of the record is that he did say, and several people drew the conclusion, that he was suicidal. And that, therefore, it's a tighter issue as to a fact whether the treating physician that receives him back did or didn't know when he sends him to the infirmary. But you may be right. Fine. Go ahead. Let's assume, for argument's sake, that that's true. The deliberate indifference requires far more than what the record shows here. Deliberate indifference under Pruniciaro requires that Dr. Lau either refuse to treat him, ignored him, his complaints, or treated him incorrectly intentionally. And we don't have any of that here. And I think from the questions I've heard so far, it's very clear that this is a choice of medical treatment. And we can go back. Don't infer from our question. No, no. You tell us, do you dispute his statement that there was a no Xanax policy printed for all doctors to follow? It doesn't say no Xanax. And this is page 5237 of the record, I believe. It's just a flow chart of what the protocol is. And Dr. Lau was a part-time government employee. He had to follow Harris County protocols. And this was the protocol. If somebody comes in and they're withdrawing from benzodiazepines, this is the way you do it. And he did. And that is medical treatment. And we can go back 50 years to Estelle v. Gamble, or we can just go back to January and this court's decision in Stevenson-Cotton to say that a disagreement among choices of medical treatment is not a constitutional violation just because it occurs in a jail. And what? Does the record indicate that Dr. Lau did think he couldn't prescribe Xanax, even if that were the best? So he interpreted this chart to mean never Xanax, even though that may be needed? Does that? I don't think the record reflects that one way or the other. I think Dr. Lau's testimony was that it didn't matter because he was replacing the Xanax with another benzodiazepine. So I think he said that Xanax is a short-acting benzodiazepine. Librium was a longer-acting benzodiazepine. So it wouldn't matter. And why would you give somebody who's addicted to Xanax more Xanax anyway? And again, it's a choice among medical treatment. And I want to speak quickly to Dr. Axelrod's report. If you're asking about the state law claims, Dr. Axelrod's report is insufficient under Texas Supreme Court precedent to make out causation between anything that Dr. Lau may have done and Mr. Lau's suicide. All he says is these departures caused Mr. Lau's death. And that is just not enough under Texas Supreme Court precedent. So even if their state law claims were preserved, and even if the statute of limitations wasn't an issue for them, the causation deficiencies in Dr. Axelrod's report is enough to affirm the dismissal of the state law claims as well. Thank you, Your Honors. All right, thank you. Harris County, Mr. Hopkins. Good morning, Your Honors. May it please the Court. I'm Seth Hopkins representing Harris County. The trial court correctly dismissed the claims against Harris County because there is no genuine issue of material fact to overcome the high burden required for municipal liability in a Monell case. In particular, appellants have not identified an official policy promulgated by an official county policymaker with deliberate indifference that was the moving force behind a constitutional injury. Appellants have suggested two policies, and I'll address both of them. First, appellants contend that Harris County had an unconstitutional policy of not providing Xanax to those addicted to Xanax. This is wrong for several reasons. First, there was never a no Xanax policy. Dr. Laxman Sunder, one of the jail physicians, made a chart to help his colleagues remember standard medical protocols for handling withdrawal from substances including benzodiazepine. On pages 7740 and 7744 of the record, Dr. Sunder testified that while he made this chart to be helpful, to help physicians, he instructed physicians that they were to use their own medical professional judgment and that nothing prevented them from prescribing Xanax if they believed that it was appropriate. However, most doctors don't believe that Xanax is medically appropriate because of the same factors that make it so addictive. There's a quick high, a quick low, and the doctors prefer something called Librium, which is slower acting, lasts longer, is safer, and has better outcomes. The chart that Dr. Sunder posted was a chart that was found in standard correctional journals, or very similar to those found in correctional journals, and we cited, I believe, footnote 40 of our brief when we talk about that. Even if there had been a no Xanax policy, and even if Xanax was the best treatment for Mr. Young's addiction, appellants would still not have been able to impose Monell liability because following the advice of physicians and prescribing a well-recognized protocol isn't deliberately indifferent, even if the treatment is unsuccessful. This year in Ford versus Anderson County, this circuit reiterated the extremely high standard for deliberate indifference to a medical need in a correctional setting, and described it as refusing to treat a detainee, ignoring his complaints, or intentionally treating him incorrectly. Missing a diagnosis in negligence are not deliberate indifference. When applied to suicide cases, this circuit has repeatedly held in cases such as Cope, Bonella, and Baldwin that a public entity has a duty to protect detainees only from known suicidal tendencies. And Judge, I believe you had asked the question about what the record showed red flags about suicidal tendencies. In my review of the record, I've not found a single medical chart dating back for 10 years of treatment at the Harris County Jail of Mr. Baldwin where he had ever told a medical professional that he had suicidal tendencies. What we see in the record is that there was an Officer Dogen, 36 hours before, who had another inmate come to him and say, man, this guy, he's talking like he, I'm just not comfortable with how he's talking. So Officer Dogen took the initiative to call in Mr. Young, ask him about it, and even though Mr. Young denied being suicidal or denied, didn't want treatment, Officer Dogen took the initiative to require that he get treatment, to require that he see mental health staff. Mental health staff came the next morning and they talked to him. They recognized that he didn't seem right, that it was really their blood pressure that they were concerned with. He didn't want mental health treatment. They still brought him to Bentop Hospital to be taken care of. So all of the evidence shows that Harris County Jail, that its policies were not constitutionally deficient, that every time there was anything, not even a red flag, a yellow flag that arose, they took the initiative to try and take care of Mr. Young. Intake reports and the infirmary reports, there's no box ever checked, this guy's suicidal. I haven't found one in the record, no, Your Honor. And so we know that the jail took Mr. Young to Bentop Hospital. We know that all of the physicians there did complete workup. They did blood work. They believe they did a CT scan. They asked him all of the relevant questions that you would go to when you went to a hospital and then they released him and there was no indication from any of the medical professionals that he was suicidal. Yet we still placed him in the infirmary under close observation. For a normal detainee, observations are every 60 minutes. State law requires for a suicidal detainee, observations be every 30 minutes. Our policy requires every 25 minutes. And when Mr. Young was brought to be observed in the infirmary, there could be no allegation that we were short-staffed either because the record shows that we had six times the amount of staffing that was required by state law. So we were observing improperly under our policies. We were treating improperly under our policies. But this is getting a little further afield from the actual arguments being made now to us, correct? Correct. In other words, the Romero and the amount of monitoring is not presently before. Not present. I can talk about it if the court would like. Okay. It's not raised by appellant. Are there any questions? I guess I always have some questions. Your relationship with Dr. Lau, how would you describe it? I know, how would you describe the relationship? Is he an independent contractor working with Mint? Yes, Your Honor. He's not an employee of yours. That's correct. But you pay? Describe the relationship. My understanding is that we pay Mint, who pays Dr. Lau. And in your brief, footnote five, you describe, you dispute that he was an employee of Mint's. In other words, if I remember in the appellee brief, it states that the contract that he had was not one of an employer employee with Mint. He was an independent contractor. They staffed him in the prison. I don't recall that we briefed that. That may have been Dr. Lau's briefing. I think it probably was, yeah. Thank you. Are there any other questions for Harris County? No, sir. Thank you. Thank you, Your Honor. All right, Ms. Lewis, you have her bow. Thank you. How we would like the ruling to be is that the court hold that there is a written policy here and it is a deliberately indifferent policy because the written policy that steers medical providers away from Alprazolan that will result in a known death, excuse me, a known possible death is deliberately indifferent on its surface. What's the written policy here in the record? Identify the written policy here. The written policy is the flowchart flowing medical providers away from prescribing Alprazolan when a person enters the jail on Alprazolan. And I think that there's been a lot of talk about the fact that he's gotten other benzodiazepines, but benzodiazepines are prescribed for different reasons, for important reasons. And that is kind of akin to, I'm sorry if I'm speaking too low, but kind of akin to an antibiotic. There's many antibiotics. There's many benzodiazepines, but we know that certain reasons are given why benzodiazepine, excuse me, antibiotics are given to treat certain ailments. And that's the same with benzodiazepine. There's no rational reason why they are refusing, that there's a refusal to allow this in the jail. But as far as Dr. Lau is concerned, I just wanna address two things really quick that hasn't really been brought up. As far as Dr. Lau is concerned, he testified in his deposition that he knew that the result of abruptly discontinuing somebody from their Xanax medication withdrawals will result in suicide. He testified to that in his deposition. And in addition to that, he, our experts support that as well. So it's not that he knew exactly what could be the result of taking this benzodiazepine away from him, particularly Xanax. And as far as, so that's what I would say it is a written policy that can result in death. And that in and of itself is deliberate indifference. As far as the sheriff is concerned, he delegated that duty to allow that policy to go forward. So he does have liability on that sense, delegating that duty to the medical providers to allow this policy to go forward. How do you fit all this into, well, I mean, on the Monell, but I guess you're rebutting on the whole case, but at bottom, how do you overcome the deliberate indifference? It's just, it's a humongous hurdle. It is. I mean, merely showing negligence, and you may be arguing that there was negligence, et cetera, maybe even gross negligence, but I mean, the cases are legion. Right. And gross negligence doesn't get delivered. So at the end of the day, don't we have to? Well, let me, I can explain that. So the deliberate indifference on two fronts. One, I do believe that there is negligence without question here, and I think we have statute of limitation issues there, but you can go back and look at the notes, excuse me, at the progress notes on 6745, and you'll see that there is actually a progress note from Dr. Lau on the 13th. And as far as the deliberate indifference is concerned, the fact that Mr. Young cried out, if not verbally, that he was suicidal, enough that other people around him recognized that he was suicidal, and for Harris County to not put him in a place where he can be protected from self-harm is deliberate indifference. It is written. Officer Dogan actually filled out a referral form for Mr. Young to, based on his concerns of his being suicidal. That's very rare in these cases that you have a suicidal person that is actually written that, and there's documentation that this person is suicidal. Because as Judge Higginson pointed out, there's many times a defensiveness, a denial of that, but here we have other outside people identifying this suicidal tendency that, I mean, ideation that he had. Was opposing counsel right in saying other than Rogan or Dogan, there is no other piece of evidence in this record that suggests that people drew the conclusion that he was suicidal? Well, yes, Dogan also, in his statement, he also said that he let two other people know. He went down to the clinic, and he also let two other detention officers know as well. It's just him. The problem. And the inmate. But, and the inmate, I see. Okay, so it is just that, but then there was a team that did come down. I'm sorry? There was a team that, as a result of that correctional officer, they came, correctly? No. No? No, no. And that's- And that's when Young said, I don't want a psychiatric about him. Right, and that's the issue. They took him to a holding cell. He came out with a bloody face. Then they took him down to, put him in this, in this place where he ultimately lost his life. This, which, you know, it should have been a place where he was protected from harm, where the bedding and so forth was taken away from him. And the qualified immunity issue- They gave you an additional two minutes. You had run out of time. Oh, thank you. Oh, okay, thank you. So you can make that point in whatever. Okay, so as far as the qualified immunity is concerned, I think this court has spelled out quite clearly in Sanchez versus Oliver that a person in Dr. Lau's position is not entitled to qualified immunity. He does not work. He is not for Harris County. He is not a part-time employee for Harris County. He does not work. That is when he would be entitled to qualified immunity. That is not the case here. And it was, it was a lot, there were a lot of cases in Sanchez that this court relied on to get to that place. And there was a case that was similar. I believe it was out of the Ninth Circuit. It was physician's assistants, excuse me, psychiatric assistants that tried to invoke qualified immunity. And they were, they were, it was rebuked. What's the closest case? I know there's no identical case, but what's the closest case or best case that you have for the scenario, the factual scenario presented in this case? I mean, we have lots of jail suicide. I mean, what's the best case? You know that. Yeah, it's the case out of the Ninth Circuit. I believe it might be Tanner. I'm sorry. I, the name is escaping me, but it is cited in, in, yes, in Sanchez. And it is also, my time is running off, but it is cited in Sanchez and it is just spelled out right there in the actual case. Well, if I could. No, go ahead. Because I'm not, Judge Stewart's question may have been not necessarily on whether a private actor is eligible for qualified immunity. Is that what Tanner stands for? It might've been just your best case on deliberate indifference in these circumstances. Is that what that is? No, no, it's not. No, it's not as far as qualified immunity is concerned. Yes. Perhaps the question was more, what would you just leave us with in terms of assuming that, assuming that he's eligible to invoke the qualified immunity defense? If he's eligible to invoke qualified immunity, the fact that he was aware that, and recognize that he was withdrawing from Xanax, that is undisputed, that Dr. Lau was aware of that. That's why he prescribed the medications that he claims he described. Again, it's, but the reason that the fact that he knew that it would result in suicidal ideations was the deliberate indifference. At least he could have let where he was, the infirmary where he was sending Mr. Young to know this man is subject to suicidal ideations because of Xanax withdrawal. He needs to be watched. That never happened from Lau. He never told anybody that what he understood as a physician that this would be the result. And that is the deliberate indifference policy that was a moving force behind Mr. Young's death. Thank you. Okay, thank you, Ms. Lewis. All right, thank you, counsel, both sides, the briefing and argument. These jail suicide cases are always gripping, but we'll get it decided. This completes the orally argued cases for this panel for this week. They, along with the non-orally argued cases will be submitted. And with that, the panel stands adjourned.